UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

**CURTIS MOORMAN, ET AL.**                                                                 **PLAINTIFFS**

v.                                                                                    No. 5:18-cv-21-BJB

**JESSE COOMBS, ET AL.**                                                                   **DEFENDANTS**

\* \* \* \* \*

**OPINION REGARDING DENIAL OF STAY**

Before this § 1983 trial began, the Plaintiffs challenged the racial makeup of the potential jurors. The Plaintiffs are three black prison inmates; the Defendants are three white (former) correctional officers; one of the 40 prospective jurors self-identified as black (another listed "mixed race"). The disparity between the demographic makeup of this jury panel and that of the jury division as a whole, according to the Plaintiffs, suggested that the potential jurors may not have been "selected at random from a fair cross section of the community" as the Jury Selection and Service Act requires. 28 U.S.C. § 1861.

The Plaintiffs first raised this challenge on March 11—six calendar days and four business days before trial began—after receiving preliminary juror information according to the Court's ordinary disclosure schedule. *See* Objection (DN 126). Plaintiffs' counsel noted that only a single black juror appeared in the panel information and objected that this composition didn't represent a fair cross-section of the community within the Louisville Division. *See id.* After briefly discussing the objection at the final pretrial conference, DN 129, the Plaintiffs filed an emergency motion to continue the trial on March 13, DN 130. The Court immediately scheduled a telephonic hearing for the following morning.

During that hearing, Plaintiffs' counsel admitted that he lacked evidence of any procedural or systemic flaw in the Court's jury-selection procedures (though he sought more information from the Clerk in hopes of identifying one). In response, the Court ordered the Clerk to docket, under seal, the three most recent "AO-12 forms" from the Louisville Division and additional AO-12 "by pool" forms.[1] The Court also

---

[1] An AO-12 form is created by the Administrative Office of the Courts and regularly filled out by individual Clerk's Offices. It:

> provides the following information on the current, non-emptied master jury wheel used by the Division: (1) general information about the master wheel, including identification of the source data and number of names placed in the

1

set a second hearing for that afternoon and made the Deputy Clerk available to speak to the jury-selection procedures in response to questions from counsel and the Court. DN 140. During that second hearing, the Court overruled the objection and denied the emergency motion to continue (without prejudice) as insufficiently supported. But the Court also confirmed that the Clerk would soon release the additional "AO-12s by pool," which hit the docket immediately following the hearing. *See* DN 143 (recounting this procedural history). All told, counsel received the Deputy Clerk's testimony as well as eleven different batches of otherwise nonpublic statistical data related to jury-selection procedures and outcomes. DNs 134–36, 142; *see* 28 U.S.C. § 1867(d).

On the Saturday before trial, the Plaintiffs presented their conclusions about that data. Motion for Stay (DN 144). According to an affidavit submitted by Plaintiffs' counsel, black representation on the "jury wheel" and in the "jury pools" for the prior year was between 33% and 50% lower than counsel calculated it should've been based on the demographic breakdown of the Louisville Division. Sworn Statement of Facts (DN 144-1) at 2. On that basis, the Plaintiffs asked the Court to "stay th[e] proceedings" in this case, pending selection of new potential jurors. Motion for Stay; *see* § 1867(d). The Court denied the stay and proceeded to select the jury for reasons explained briefly on the record in open court and more fully below.

\*

The Supreme Court decades ago traced the fair-cross-section requirement to the Sixth Amendment's protection of an accused *criminal* defendant's right to a trial by jury: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed…." U.S. CONST. amend. VI. "It is part of the established tradition in the use of juries as instruments of public justice," Justice Black explained, "that the jury be a body truly representative of the community." *Smith v. Texas*, 311 U.S. 128, 130 (1940); *see also Taylor v. Louisiana*, 419 U.S. 522, 529 (1975) ("We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed

---

> wheel; (2) data related [to] the sampling of returned questionnaires, including [the] number of forms mailed, returned, returned undeliverable and demographic data concerning the race, ethnicity, and sex of those individuals returning forms; (3) data related to the sampling of the qualified jury wheel including relevant demographic data of the qualified wheel; and (4) a comparison of the jury wheel sample against the population of the jury division.

*United States v. Johnson*, 95 F.4th 404, 414 n.3 (6th Cir. 2024); *see also* Nina W. Chernoff & Joseph Kadane, *Preempting Jury Challenges: Strategies for Courts and Jury System Administrators*, 33 JUSTICE SYSTEM JOURNAL 47, 59 (2012).

by the Sixth Amendment and are convinced that the requirement has solid foundation."). This does not mean, however, that a criminal defendant has a right to a "jury of any particular composition." *Taylor*, 419 U.S. at 538. Indeed, the Sixth Amendment "impose[s] no requirement that petit juries actually chosen … mirror the community and reflect the various distinctive groups in the population." *Id.* Put simply, the Constitution requires a fair *process*—that "petit juries … be *drawn* from a source fairly representative of the community"—not a specific result. *Id.* (emphasis added).

Congress extended these Sixth Amendment protections to the civil context with the Jury Selection and Service Act of 1968. "[A]ll litigants in Federal courts entitled to trial by jury"—not just criminal defendants—"shall have the right to grand and petit juries selected at random from a fair cross section of the community." 28 U.S.C. § 1861. The Act, according to the Ninth Circuit, "codifies the Supreme Court's decisions" interpreting the Sixth Amendment's fair-cross-section requirement and "extends their applicability to the selection and composition of grand juries." *United States v. Miller*, 771 F.2d 1219, 1227–28 (9th Cir. 1985).

Unsurprisingly, given these common roots, courts evaluate fair-cross-section challenges to jury-selection procedures under the JSSA using the same standard that applies to challenges under the Sixth Amendment's fair-cross-section right in criminal cases. *United States v Ovalle*, 136 F.3d 1092, 1099 (6th Cir. 1998); *United States v. Allen*, 160 F.3d 1096, 1102 (6th Cir. 1998) (tests are "essentially identical"). That standard, according to the Sixth Circuit, has three components. A challenger must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*United States v. Johnson*, 95 F.4th 404, 410–11 (6th Cir. 2024) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).

The parties' arguments focused on the third component: systematic exclusion.[2] According to the Plaintiffs, the statistical disparity evident in the persistently lower

---

[2] In making this argument, however, the Plaintiffs "poin[t] back to prong two: the disparity between the percentage of African Americans on [their] venire and in the community." *United States v. Gray*, No. 5:22-cr-15, 2024 WL 4520953, at *1 (W.D. Ky. Oct. 17, 2024). Because their challenge ultimately fails, however, it matters little where in the

3

representation of black prospective jurors, relative to their presence in the community, necessarily implies that the selection process systematically excludes them. The Defendants, in response, highlight the lack of any evidence indicating a flaw in the procedures themselves and attack the Plaintiffs' statistical analysis. Response (DN 145).

A "systematic exclusion," as characterized by the Sixth Circuit, is one "'inherent' to the jury selection process." *Johnson*, 95 F.4th at 412 (quoting *Allen*, 160 F.3d at 1104. This requires the challenger to show either some "specific procedural or operational flaw" or else a "large routine discrepancy" implying such a flaw and attributable to the Court's exclusion of the underrepresented group in question. *Id.* The Plaintiffs have not identified any procedural or operational flaw that led to the makeup of their jury pool. As counsel stated in open court, the Plaintiffs have identified no specific step in the Division's selection procedures that tends to exclude black jurors. Rather, Plaintiffs contend, the statistical disparity between black citizens qualified and selected for jury service and their population in the broader community is so large that the only explanation must be some latent flaw in the process. This "large routine discrepancy," according to the Plaintiffs, requires the Court to select a new jury in this case.

On this argument, the Plaintiffs face an uphill battle. "[N]onextreme statistical disparities, standing alone, are ordinarily insufficient to satisfy this requirement" to demonstrate systematic exclusion. *Johnson*, 95 F.4th at 413 (citing *Bates v. United States*, 473 F. App'x 446, 450 (6th Cir. 2012)). That is because the JSSA address a fair process, not an outcome all parties believe just. The statute guarantees litigants a jury "selected at random" from a fair cross section of the community; it "focuses only on the 'procedure for selecting juries, and not the outcome of that process.'" *Johnson*, 95 F.4th at 410 (quoting *Ambrose v. Booker*, 684 F.3d 638, 645 (6th Cir. 2012)). Indeed, the Sixth Circuit has never held that statistical disparities alone suffice to show systematic exclusion. *United States v. Jackson*, 768 F. App'x 400, 405 (6th Cir. 2019).

And the decisions that *do* find systematic exclusion feature obvious procedural flaws. *See, e.g.*, *Garcia-Dorantes v. Warren*, 801 F.3d 584, 603–04 (6th Cir. 2015) (inadvertent computer glitch underrepresented black citizens); *Smith v. Berghuis*, 543 F.3d 326, 340–41 (6th Cir. 2008) (county procedures allowing generous opt-outs and reassignment of black jurors to district court caused underrepresentation in circuit courts), *rev'd on other grounds*, 559 U.S. 314 (2010). Accordingly, the courts of appeals have required challengers to point to some external factor tainting the selection process, not just the statistical output of that process. *See, e.g.*, *Ford v.*

---

*Johnson* framework their arguments fall: a systematic exclusion of this group would not be "fair and reasonable" in relation to its presence in the community. 95 F.4th at 410–11.

4

*Seabold*, 841 F.2d 677, 685 (6th Cir. 1988) ("selection of jurors from a neutral master list, without more," can't "be construed as 'systematic exclusion'"). Nor can the reason offered be one (like, say, a group's relatively less-frequent voter registration or responses to jury summonses) that could affect the pool of prospective jurors without revealing judicial exclusion along suspect lines. *See United States v. Smith*, 108 F.4th 872, 878 (D.C. Cir. 2024) (statistical disparity due to group's failure to respond to summons not a "systematic exclusion"); *United States v. Cecil*, 836 F.2d 1431, 1448 (4th Cir. 1988) (same for failure to register to vote). Nonetheless, the Sixth Circuit has left open the possibility that statistical disparities alone might conceivably grow so great as to show systematic exclusion. *See Bates*, 473 F. App'x at 450 ("[A]n extreme underrepresentation *may* be enough to establish a *per se* systematic exclusion.") (emphasis added).

Is Plaintiffs' data enough? That's hard to say—in part because the legal standard isn't reducible to mathematical precision and in part because counsel for neither side offered any calculation. The Supreme Court has not yet had "cause to take sides … on the method or methods by which underrepresentation is appropriately measured." *Berghuis*, 559 U.S. at 329–30 (2010). Other courts have looked at two statistical models: "absolute disparity" and "comparative disparity." "Absolute disparity is the difference between a distinctive group's percentage in the general population and that group's percentage in the qualified jury wheel." *Johnson*, 95 F.4th at 413. Based on the AO-12 information available here (as calculated by the Court without the benefit of any submission by the Plaintiffs), that disparity during the most recent available jury sample (taken on November 18, 2022) was 4.59%. In other words, black citizens make up 15.2% of the jury-eligible population but only 10.61% of the qualified jury wheel. 11/18/2022 AO-12 (DN 136) at 1. As to comparative disparity, "one must divide the absolute disparity of the distinctive group 'by that group's percentage in the general population.'" *Johnson*, 95 F.4th at 413 (quoting *Garcia-Dorantes*, 801 F.3d at 601). "[C]omparative disparity is a 'more appropriate measure of underrepresentation' when the overall population of a distinctive group is small, [but] it can still lead to misleading results where … the distinctive group is also only a small percentage of the community's jury-eligible population." *Id.* (quoting *Garcia-Dorantes*, 801 F.3d at 600–01). It "measures the decreased likelihood that members of an underrepresented group will be called for jury service, in contrast to what their presence in the community suggests it should be." *Id.* (quoting *Garcia-Dorantes*, 801 F.3d at 601). Here, the comparative disparity is 30%.

Courts across the country have rejected challenges offering similar figures. As to absolute disparity, courts are generally reluctant to find a systematic exclusion of a racial group from the jury pool if "absolute disparities are less than 10%." *Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 268 (3d Cir. 2019) (quoting *United States v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998)). The absolute disparity here

5

is less than half of 10%. And many courts of appeals have rejected absolute-disparity challenges with figures greater than the figure here. *See, e.g.*, *id.* (5.83% insufficient); *Thomas v. Borg*, 159 F.3d 1147, 1151 (9th Cir. 1998) (5% absolute disparity insufficient even though no blacks were on jury panel); *United States v. Gault*, 141 F.3d 1399, 1402-03 (10th Cir. 1998) (5.74%, and 7.0% absolute disparities insufficient); *see also United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994) (3.4% absolute disparity insufficient); *Ramseur v. Beyer,* 983 F.2d 1215, 1232 (3d Cir. 1992) (absolute disparity of 14.1% "borderline"); *United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir. 1982) (4.7%, and 7.7.% absolute disparities insufficient). Under this precedent, the Plaintiffs' statistical disparity doesn't by itself indicate that the Court's jury-selection procedures have (presumably unwittingly) excluded black citizens from the process on a systematic basis. *See Johnson*, 95 F.4th at 412–13.

The same is true for comparative disparity. Courts of appeals have affirmed the rejection of challenges based on comparative disparities larger than the 30% presented here. *See Howell*, 939 F.3d at 268 (54.49% insufficient); *United States v. Chanthadara*, 230 F.3d 1237, 1257 (10th Cir. 2000) (40.89% insufficient where the distinctive group represented 7.9% of the population); *United States v. Clifford*, 640 F.2d 150, 155-56 (8th Cir. 1981) (46% insufficient where the group represented 15.6% of the population). So the Plaintiffs fall short by this measure, too.[3]

The Plaintiffs, for their part, didn't indicate which of these accepted statistical measures is more accurate or appropriate for the analysis here. Nor did they attempt to show either comparative or absolute disparity. They simply presented their own rudimentary calculation of a disparity between 33% and 50%. Sworn Statement of Facts ¶¶ 7, 9. Counsel's affidavit appears to have compared the black population of the Louisville Division and the black population of the jury wheel and expresses that

---

[3] The Clerk's office also disclosed to the Plaintiffs the jury "pools"—groups of approximately 350 persons qualified and selected to serve as potential jurors in the Louisville Division—across the past twelve months. DN 142. This included a total of 3,003 prospective jurors—the citizens randomly drawn by the Court from the master jury wheel, which itself includes all the citizens who received and returned a notice. The clerk pulls these pools several times a year and uses them to draw approximately 40 (in a civil case) or 60–70 (in a criminal case) potential jurors. These jurors are randomly selected to make up the venire in a given trial. The average absolute disparity between black jurors in this group and the community as a whole was 5.56%. That's only slightly higher than the absolute disparity among the qualified jury wheel—the unit of analysis examined in *Johnson*. And it's far below the 10% benchmark below which courts generally won't find a "large" discrepancy. Likewise, the average comparative disparity was 36.6%—a figure well within the bounds of the precedent described above.

difference as a percentage.[4] So instead of an absolute disparity of 4.59% (15.2-10.61), counsel sees a disparity of "roughly" 33% (because 10.61 is "roughly" 33% lower than 15.2). *Id.* ¶ 7. Nor did his submission cite any precedent supporting his method of analysis—or any conceivable flaw or potential improvement in the process that could reveal *how* or *why* the Court's jury-selection process might produce an unrepresentative cross section of the community. In other words, Plaintiffs have identified a potential problem—the limitation of black peers among the venire in this case and the jury pools in others—that would be alarming if true. But they haven't given any reason to believe this is the result of actual unlawful exclusion rather than other benign statistical or demographic factors; the submissions fail to identify any reason for that difference, any cause for it that relates to the Court's jury-selection process, or any solution that might lead to a better or fairer process.[5]

This omission reveals why the single precedent Plaintiffs cited in support, *Duren v. Missouri*, undermines their stats-only approach. In *Duren*, the Supreme Court held that women were statistically and unconstitutionally underrepresented on juries in Jackson County, Missouri: 54% of the population was female but jury venires were only 15% female. 439 U.S. at 364–65. But the analysis didn't end there. The specific procedural reason for this disparity was readily apparent in the record and to the Court—the County granted women, but not men, an "automatic exemption" upon request. *Id.* at 359–360. This "quite obviously" explained why women were less likely to appear on jury panels than men were. Statistics alone were not enough. *Id.* at 367.

Nor were the Plaintiffs' calculations enough to halt this trial. Absent even a theoretical explanation for the disparity identified by Plaintiffs, the Court cannot

---

[4] Counsel also removed the lowest and highest instances of black representation on the jury wheel, without explaining why he did so, much less citing any legal or academic authority. Sworn Statement of Facts ¶ 8.

[5] Nor is it likely they could. Divisions within this District draw jury panels from three sources: "(a) The Kentucky Secretary of State's voter registration lists; (b) The State of Kentucky Department of Motor Vehicles' licensed drivers list; and (c) The State of Kentucky I.D. list." U.S. District Court for the Western District of Kentucky, General Order No. 21-01: Plan for the Qualification and Random Selection of Grand and Petit Jurors (Jan. 4, 2021) § 2.03. The District thus draws from a more diverse (and presumably more representative) set of sources than voter rolls, even though the voting population alone would suffice as the "presumptive statutory source for potential jurors." *Gray*, 2024 WL 4520953, at *2 (quoting *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008)). And, as the Deputy Clerk explained, the Court pulls names from these sources randomly and mechanically. This process appears entirely consistent with the Supreme Court's ruling (in the criminal context) that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538.

7

conclude that it results from a systematic exclusion of potential black jurors in violation of the Plaintiffs' right to a trial before a jury selected from a fair cross section of their community.

\* \* \*

The Court respects the Plaintiffs' right to a fair jury trial, appreciates counsel's arguments in favor of a stay and re-selection, and doesn't take lightly the racial disparities identified in this particular jury panel and the overall pool of prospective jurors. *See Gray*, 2024 WL 4520953, at \*3. But the question as framed by Congress and the Constitution is whether the selection process is a fair one that was fairly applied in this case. The answer here is unequivocally yes. As the Deputy Clerk testified, the jury-selection procedure in this District is "randomized" and "race-blind." *See* Order (DN 143) at 1 (summarizing Deputy Clerk's testimony). Nothing in the record reveals any flaw or exclusion in the selection of this jury. That's why the Court denied the request to stay this trial and pick a new jury. And that's why—if the Court *had* picked a new jury panel—it presumably would've done so according to the same process used the first time, since the Plaintiffs offered no alternative other than spinning the wheel a second time. Any difference between the first and second tries would've been a statistical anomaly—not a remedy required by law.

With the benefit of hindsight, moreover, the jury ultimately selected in this case does indeed appear to have heard the evidence and followed the law without fear or favor. It listened respectfully, deliberated for hours, and ultimately found in favor of two Plaintiffs on two counts and in favor of the Defendants on the rest. The process that selected the jury sufficed under Sixth Circuit precedent, which is why the Court denied the motion to stay, proceeded to trial, and now offers this fuller explanation of its application of the law and facts.